1  Darrel Menthe, Esq. – (SBN 186252)
   Adam I. Miller, Esq. – (SBN269990)
2  MILLER MILLER MENTHE
   ATTORNEYS AT LAW
3  17701 Cowan, Suite 150
   Irvine, CA 92614
4  (714) 450-3800  Phone
   (714) 450-3801  Facsimile
5  Email: dmenthe@millermenthelaw.com
   Email: amiller@millermenthelaw.com

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 SEALED,                              Case No.  CV12-00570 PA (MRWx)

12
       Plaintiffs,
13                                      ORGINAL
   -vs-
14
   SEALED,
15
       Defendants                       QUI TAM COMPLAINT
16

17
                                        FILED UNDER SEAL PURSUANT
18                                      to 31 U.S.C.A. § 3730

19

20

21

22

23

24

25

26

27

28

- 1 -
**QUI TAM COMPLAINT**

Scott D. Miller (SBN 66874)
Darrel C. Menthe (SBN 186252)
Adam I. Miller (SBN 269990)
**MILLER MILLER MENTHE**
17701 COWAN, SUITE 150
IRVINE, CA 92614
(714) 450-3800 Phone
(714) 450-3801 Facsimile

Attorneys for Plaintiffs William Davis and Spencer Miller

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES ex rel. WILLIAM DAVIS, an individual and SPENCER MILLER, an individual<br><br>PLAINTIFF,<br><br>-vs-<br><br>DEFENDANTS<br><br>AMGEN, INC., a Delaware Corporation; P4 HEALTHCARE, LLC, a Delaware Limited Liability Company; MEDTREND INTERNATIONAL, INC., a Delaware corporation; HEALTHCARE SOLUTIONS HOLDING, LLC, a Maryland Limited Liability Company; and RAJ MANTENA, an individual. | CASE NO.: CV12-00570 PA (MRWx)<br><br>**COMPLAINT UNDER FALSE CLAIMS ACT**<br>**(31 U.S.C. § 3729 ET SEQ.)**<br><br>**FILED IN CAMERA AND UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

**ORIGINAL**

1

COME NOW PLAINTIFFS, THE UNITED STATES OF AMERICA, and QUI TAM Plaintiffs WILLIAM DAVIS and SPENCER MILLER by and through their respective attorneys, who allege under the False Claims Act, 31 U.S.C. § 3729 et seq., against AMGEN, INC., P4 HEALTHCARE, LLC, HEALTHCARE SOLUTIONS HOLDING, LLC, MEDTREND INTERNATIONAL, INC., and RAJ MANTENA and respectfully allege as follows:

## INTRODUCTION

1. The False Claims Act was instituted to permit individuals and whistleblowers to act as private attorney generals in pursuing on behalf of the United States government claims of presentation of false claims that have resulted in damages to the United States.

2. The statute provides liability against a person who: (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true; (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly

avoids or decreases an obligation to pay or transmit money or property to the Government.

3. The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), prohibits individuals or entities from knowingly and willfully offering, paying, soliciting or receiving remuneration to induce referrals of items or services covered by Medicare, Medicaid or any other federally funded program. The Office of the Inspector General at the Department of Health and Human Services has issued detailed regulations and advice concerning the prohibitions against activities that run afoul of this statute. A substantial discussion of these is provided at 68 FR 23731 (2003). This action is based on the following general false claims: Defendants have knowingly conspired (1) to generate substantial over-prescription of certain oncology drugs produced by AMGEN to generate unnecessary reimbursements from Medicare by using forbidden practices, including, among other things, direct payments to individuals in a quid pro quo exchange for prescribing AMGEN's oncology drugs; and (2) to manipulate and inflate the "Average Selling Price" for Medicare and the "Best Price" for other government agencies, including Public Health Services ("PHS"), the Veterans Administration ("VA") and the Department of Defense ("DoD") for oncology drugs by concealing, among other things, rebates and kickbacks. These actions have cost the United States government vast sums in unnecessary reimbursements related to such drugs.

**PARTIES**

4. Plaintiffs are the United States of America and Relators WILLIAM DAVIS and SPENCER MILLER.

5. Relator William Davis is the Oncology Business Unit Sales Planning Director at AMGEN and Relator Spencer Miller is the Aranesp Oncology Marketing Senior Manager at AMGEN. Each has been in a unique position to learn of the wrongdoing of Defendants.

3

6. Defendant AMGEN, INC., ("AMGEN") is a corporation organized under the laws of the state of Delaware, headquartered in Thousand Oaks, California.

7. Defendant P4 HEALTHCARE LLC ("P4"), on information and belief is a Delaware Limited Liability Company registered to do business in California.

8. Defendant MedTrend, on information and belief is a Delaware corporation with its headquarters in Maryland.

9. Defendant HEALTHCARE SOLUTIONS HOLDING LLC, on information and belief is a Maryland Limited Liability Company with its headquarters in Maryland, and is the operator of P4 Pathways.

10. Defendant RAJ MANTENA on information and belief is an individual resident in Florida.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

12. Venue is proper under 31 U.S.C. § 3732 which provides that any *qui tam* action may be brought "in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Defendants transact business in Los Angeles County and throughout Southern California within the territorial jurisdiction of this Court.

## GENERAL ALLEGATIONS

### I. AMGEN's Oncology Drugs and Business Model

13. Defendant AMGEN is a biotechnology manufacturer in the business of producing cancer-treating drugs. Among the oncology drugs AMGEN produces are: (i) Neupogen (pegfilgrastim); (ii) Neulasta (pegfilgrastim); (iii) Xgeva (denosumab); (iv) Prolia (denosumab); (v) Aranesp (darbeotin alfa); (vi) Vectibix (panitumumab);

4

and (vii) Nplate (romplostim). Neupogen and Neulasta selectively stimulate the production of white blood cells to defend against infections associated with chemotherapy-induced neutropenia. Neupogen is a short acting agent with daily administration following chemotherapy and Neulasta is a long acting agent with one dose per cycle of chemotherapy. Xgeva (denosumab), is indicated for the prevention of skeletal-related events in patients with bone metastases from solid tumors that are treated by Oncologists and Urologists. Prolia is used for treatment induced bone loss. Aranesp (darbepoetin alfa) treats deficient red blood cell counts in patients undergoing chemotherapy for non-myeloid malignancies. Vectibix is a fully human monoclonal antibody that binds with high affinity to EGFRs (epidermal growth factor receptor) and interferes with signals that might otherwise stimulate growth and survival of the cancer cell. Vectibix has received FDA approval for monotherapy treatment of third line metastatic colorectal cancer. Nplate (romiplostim) is the first platelet producer for the treatment of thrombocytopenia in splenectomized (spleen removed) and non-splenectomized adults with chronic immune thrombocytopenic purpura.

14. Under the AMGEN oncology drug business model, these oncology drugs are not sold directly to the public, but are sold to treating physicians via intermediary wholesalers. Physicians pre-order drugs from wholesalers and then prescribe those drugs to their oncology patients. It is a primary business goal of AMGEN to increase sales of its oncology drugs.

15. Once the oncology drugs are prescribed, reimbursements from various government agencies are obtained by the physicians and/or patients for the cost of the drugs based upon either the "Best Price" or the "Average Selling Price," depending on the agency. The Best Price means the lowest price available to any wholesaler, retailer, provider, health maintenance organization (HMO), nonprofit entity, or the government. The Best Price has been defined as the lowest quarterly price provided to any one customer for any specific National Drug Code ("NDC"). The Average

1  Selling Price is calculated by taking the Manufacturer's net sales to all purchasers in
2  the United States for an NDC in a calendar quarter, and then dividing it by the total
3  number of the net units of the NDC sold.  The Best Price and Average Selling Price
4  are inclusive of any cash discounts, free goods contingent upon purchase of the drug,
5  volume discounts, and rebates.  The rate of reimbursement for the drugs is Best Price
6  or Average Selling Price plus 6%, depending on the government agency involved.

       16.    The use of the Best Price and Average Selling Price to determine reimbursement amounts is a key part of reducing costs to the government because, among other things, there is no effective competitive market for most of AMGENs oncology drugs.  Thus, as a general matter, increases in most AMGEN oncology drug prescriptions do not displace other drug prescriptions, but directly add to the costs of medical care reimbursement.  For the one drug, Xgeva, where there is real competition, AMGEN's drug is twice as expensive as the competitor's drug.

       17.    AMGEN's oncology drugs are very expensive.  Their approximate costs to the government, during the first quarter of 2012, are as follows: (1) Neulasta is $2,727.962 under Average Selling Price + 6% per 6mg dose and $2,010.81 under Best Price per 6mg dose; (2) Xgeva is $1,736.16 under Average Selling Price + 6% per 120 mg dose and $1,237.50 under Best Price per 120 mg dose; (3) Aranesp is $1,598.50 under Average Selling Price + 6% per 500 mcg dose and $1,233.80 under Best Price per 500 mcg dose; (4) Vectibix is $872.31 under Average Selling Price +6% per 100 mg dose and $643.66 under Best Price per 100 mg dose; (5) Prolia is $868.08 under Average Selling Price + 6% and $550 under Best Price per 60 mg dose; and (6) Nplate is $1,168.70 under Average Selling Price + 6% per 250 mcg dose and $853.23 under Best Price per 250 mcg dose.

       18.    AMGEN's US Oncology Business Unit had estimated gross sales of $7.22 Billion in 2011, with roughly 50% of such sales involving reimbursement by

6

government agencies. Since 2008, AMGEN's US Oncology Business Unit's annual sales have exceeded $6.48 Billion.

19. Due to the size of such sales, even relatively small manipulations of the Best Price and Average Selling Price of these drugs will have a substantial impact on the United States Government in terms of excess claim payments. Similarly, due to the cost of such drugs, additional unnecessary prescriptions will also have a substantial negative impact on the United States government in terms of excess claim payments.

20. Due to the expense of such drugs and the need for clarity with the Anti-Kickback statute, Medicare and other government agencies have accordingly adopted a set of rules designed to reduce incentives to physicians to order and prescribe such pharmaceuticals, so as to make sure that the patients need is the only factor influencing a doctor's decision when prescribing one of AMGENs oncology drugs. *See, e.g.,* 68 FR 23731 (Advisory statement of Office of Inspector General of Department of Health and Human Services).

## II. AMGEN's Relationship with P4 and Raj Mantena:
## Illegal Kickbacks Inflating Best Price and Average Selling Price

21. P4 is in the ostensible business of selling data, running advisory boards, web seminars, speaker programs, providing market research, running "Summits" for the alleged purpose of educating doctors, and creating prescription pathways for optimal patient care.

22. P4 operates in a manner distinct from those companies generally understood to be P4's competitors. On behalf of P4, Raj Mantena approaches AMGEN and directly offers that in exchange for specific sums of money in the millions of dollars, he will generate specific amounts of prescriptions and sales of AMGENs oncology drugs in multiples of such sums.

7

23.   Because Xgeva is also utilized for Prostate Cancer in the Urologist offices, P4 has also recently started engaging in the same behavior with regard to urologists. In fact, P4 has been a focal point of AMGEN's attempt to launch Xgeva in the urology market.

24.   P4 engineers secret rebates to physicians and intermediaries that are not disclosed in the Best Price and Average Selling Price, thereby inflating both the Best Price and Average Selling Price. P4 effectively pays doctors to prescribe AMGEN's oncology drugs to patient, under the guise that such payments are given for the collection of data on the patient. For example, in one practice, oncologists were paid $200 per patient for whom Xgeva was prescribed in return for basically useless data on the patients, thereby increasing the incentive for the doctor to prescribe the drug.

25.   One mechanism by which AMGEN provides P4 the funds for such impermissible transactions is by hiding it in Data Purchasing Agreements with AMGEN. In these Data Purchasing Agreements, P4 charges AMGEN excessive amounts that are allegedly for the collection of patient data from physicians. The data that AMGEN contracts to receive in these arrangements is repetitive and largely unnecessary, and the cost is greatly in excess of what P4's competitors charge for such data. The data actually provided by P4 is viewed within AMGEN as unreliable, inaccurate, questionable and of little or no value. AMGEN frequently does not permit its own personnel to use such data in AMGEN's presentations due to its perceived unreliability. Midlevel managers at AMGEN, including Relator SPENCER MILLER, have informed Executive Directors of the poor quality of P4s work product.

26.   The amounts paid for such data are extraordinary, with the cost being many multiple of any reasonable value and the amount charged by P4's competitors. For example, in 2011, AMGEN purchased reimbursement data on Aranesp and the Erythropoietin Stimulating Agent market from P4's eobONE database with 1,000,000 patients from 250 Oncologists, and agreed to pay P4 $1,013,000, for said data. In a

8

similar reimbursement data purchase agreement from US Oncology, the cost of the data from a database with 16,000,000 patients and over 900 Oncologists was only $395,000. Thus, while AMGEN is paying US oncology $0.0246875 per patient's data accessed, AMGEN is paying P4 $1.013 per patient's data accessed, more than 41 times as much per patient's data accessed. P4's data is generally viewed as worthless and was not utilized by AMGEN. Similarly, in 2011 AMGEN agreed to purchase data on Neulasta and the Granulocyte Colony-Stimulating Factor ("GCSf") marketplace from P4's same eobONE database with 1,000,000 patients from 250 Oncologists and agreed to pay P4 $4,071,000. To compare it to a similar data purchase agreement with International Oncology Network Solutions (ION), the biggest group purchasing organization in the Oncology Market, with well over 5200 Oncologists in their network, the cost for such data was only $240,000. Thus, while AMGEN is paying ION only $46.15 per physician's patient level data, AMGEN is paying P4 $16,284 per physician's patient level data, more than 352 times as much per patient's data accessed, and P4's data is generally viewed as worthless.

27. In addition to Data Purchasing Agreements, AMGEN also has a practice of entering into contracts with P4 to provide webinars to oncologists and oncology practices. These payments for webinars are grossly inflated to hide kickbacks to P4 and physicians on P4's direct payroll as consultants. Two typical contracts for such webinars illustrate the massive overpayments from AMGEN to P4 hidden in the contracts. AMGEN paid a total of $200,296 to Impact Communications for thirty-two Prolia webinars, with an average of 92 Health Care Providers per webinar. For Avant Healthcare, AMGEN paid $366,417 for twenty-one Xgeva webcasts planned, with a target attendance of 25 Health Care Providers per webinar. By contrast, for twenty-four webinars with P4, wherein the guarantee is only that 96 Healthcare Providers at different sites will be present for the combined 24 programs AMGEN paid $1,656,000. When you compare P4's rate of $69,000 per program to Impact's $6,259

1 and Avant's $17,448 per-program cost, P4's charges are 11 and 4 times greater
2 respectively. From a per-attendee perspective, AMGEN pays P4 at a rate of $17,250
3 per provider attendee, 257 times greater than Impact's $67 per provider and 29 times
4 greater than Avant's $600 per provider cost. Further, while AMGEN personnel go
5 onsite to validate numbers of attendees for Impact Communication's and Avant's
6 webinars, this is not done for those run by P4.

    28. AMGEN also hides payments to P4 through Advisory Boards, run by P4's subsidiary MedTrend, which are 4-8 hour consultant meetings over 24-hour periods to either oncologists or urologists. For most such Advisory Boards, AMGEN pays to transport the doctors to the meetings, to put them up in a hotel, and pays a vendor amounts between $40,000 to $50,000 for the logistics and content preparation of the Advisory Board. Follow up Advisory Boards with the doctors, if necessary, generally cost AMGEN another $40,000 - $50,000. As such, for 2 initial Advisory Boards, and two follow up sessions, it would typically cost AMGEN approximately $200,000. The AMGEN practice with P4 is dramatically different, and shows hidden payments. P4 will run two such Advisory Boards and collect twenty medical charts ("chart pulls") from the practices of each oncologist/urologist in attendance after the first advisory board to discuss at a follow up Advisory Board. Then, P4 does a follow up Advisory Board, where based on the patient charts they educate the oncologists on how to use more of AMGEN's products. For two initial Advisory Boards, two follow up Advisory Boards and chart pulls, P4 charges AMGEN $1,850,000, substantially more than the approximately $200,000 that P4's competitors charge, with the only difference being the chart pulls, wherein the charts are utilized for the purpose of convincing doctors to write more AMGEN products.

    29. The Advisory Board getaways are also designed to coincide with P4 Summits, meetings held by P4 designed to market to doctors in a way that is otherwise forbidden to AMGEN. After the conclusion of an Advisory Board, P4 will

often conduct a P4 Summit, starting the evening the Advisory Board concludes, and lasting for up to 48 hours longer. At such P4 Summits, AMGEN will pay for a one to-two hour time period to have additional time to talk with oncologists, under the guise of market research. AMGEN will pay the Oncologists $300 to attend this session and give them feedback on a marketing slide deck, providing data on their drug, followed by questions via an audience response system asking them for the number of physicians in their practice and the impact of the data presented. This practice constitutes "payment for detailing" forbidden under federal regulations. *See* 68 FR 23731.

30. At these Summits, P4 then fills the remainder of the day with seminars that AMGEN itself would not be allowed to give including: (1) How to become more efficient at obtaining reimbursements, which includes discussions on how to prescribe dosages and amount to maximize profits; (2) Pathways and how to use products; (3) How to make your oncology practice a better and more efficient business; and (4) Continuing Medical Education Units.

31. P4 will also use these Summits to further "wine and dine" the oncologists by throwing extravagant parties in a manner that AMGEN is forbidden to do by federal regulations. An example of such extravagance dates was on or about November 17, 2006 in Las Vegas where $2,000 bottles of wines were served and Joe Torre was in attendance at a luxury suite in the newly opened Wynn Las Vegas hotel.

32. The combined effect of these payments to P4, and through P4 to doctors, is to hide rebates and kickbacks, thus inflating the nominal price of the drugs for Best Price and Average Selling Price. This conspiracy to inflate drug prices harms the United States government with substantial overpayments in reimbursements by Medicare, the PHS, VA, and DoD.

### III. The Conspiracy to Produce Over-Prescription of Drugs

33. Raj Mantena's actions described herein on behalf of AMGEN lead to the over-prescription of AMGEN's oncology drugs. As 50% of the oncology patients taking AMGEN's oncology drugs are on Medicare or some other form of government assistance, this in turn leads to the United States Government paying for expensive drugs that are in many cases not necessary.

34. Institutions at which Raj Mantena has "special relationships," include South Carolina Associates, Fort Wayne Medical Oncology, Augusta Oncology, Nevada Cancer Centers, Integrity Oncology, Elliott-Elliott-Head-Breast Cancer Research and Treatment Centers, all of which have joined the Cardinal Health GPO that was recently formed after P4 was purchased by Cardinal Health. As of November 2011, those clinics that are part of the Cardinal Health GPO have an Xgeva Market Share of 45%, while all other clinics in the nation have only a 32% market share.

35. P4 is able to generate excess prescriptions, in part, through what it calls its "special relationships" with physicians and physician organizations. P4 maintains these "special relationships" through means that would be illegal if pursued directly by AMGEN. Among other things, P4 "wines and dines" the physicians with expensive meals, vacations, flights, and even provides direct payments in exchange for prescriptions.

36. P4 also engages in other prohibited activities on AMGEN's behalf such as talking to customers about "maximizing the spread," meaning finding opportunities to maximize the difference between their cost of the drug and the government reimbursement, either through using higher doses or prescribing to more patients at certain times.

37. In order to increase prescriptions of AMGEN's oncology drugs, P4, via its subsidiary Healthcare Solutions Holdings, LLC, also provides a program called "Pathways" to physicians, which is a specially designed computer program that tells

12

oncologists what other oncological drugs should be prescribed when one such drug is prescribed. The purpose of "Pathways" is ostensibly to aid in patient treatment, but it is designed to increase the number of prescriptions and to maximize profits for the physicians and the pharmaceutical companies. When an oncologist indicates to the system what drug they are prescribing a patient, the "Pathways" program will then immediately indicate what other drugs should be prescribed to that patient, and unless the oncologist opts out of such additional prescriptions, they are automatically prescribed. Further, "Pathways," provides monitoring reports to each practice to let the practice know when doctors opt out of certain medicines, so as to ensure the maximum amount of drugs are prescribed, and a practices profits are maximized. Among the various reasons that a drug may be selected due to the "Pathways" are off-label medical purposes. This leads to the severe over-prescription of the drugs, which is evidenced by the fact that Neulasta's off-label prescriptions now account for a majority of the total prescriptions of Neulasta.

38.     AMGEN drugs are highly prevalent on the "Pathways" provided to doctors by P4. The "Pathways" is in actuality very similar to a practice that AMGEN itself had put in place called the GAP initiatives, in which AMGEN, with P4 assistance, pioneered "Pathways" in different Oncology Practices to increase the Neulasta volume in the targeted accounts. AMGEN stopped the initiative at the end of 2007 when it began to question the legality of such practice. In 2008, shortly after AMGEN ceased such practice, P4 instituted the first "Pathways."

39.     The "Pathways" program is highly successful in increasing prescriptions of AMGEN drugs. "Pathways" has an ongoing compliance program to measure physicians' adherence to the individual pathways. "Pathways" currently touts a 100% compliance rate for GCSFs or Neulasta, meaning that Neulasta is written 100% of the time where "Pathways" recommended it be written, whether "Pathways" was indicating Neulasta for in-label or off-label usage. By contrast the national penetration

13

rate, percentage of patients eligible for Neulasta for in-label purposes whom are prescribed Neulasta, is only 67%. Such data is simply not available for off-label usage as AMGEN itself is not allowed to push off-label prescriptions.

## IV. AMGEN's Complicity In P4's Activities

40. AMGEN is aware of what P4 does with doctors and intermediary institutions, and uses P4 because P4 will take these actions on behalf of AMGEN that AMGEN cannot undertake itself. AMGEN personnel know that both the certainty and the magnitude of the returns on monetary payments to P4 are not consistent with legitimate promotion activities. In many cases AMGEN takes the attitude that it "does not want to know" what P4 does, and believes that professing deliberate ignorance of specific practices will shield it from liability.

41. AMGEN executives and P4 representatives also make numerous joint calls to customers and potential customers. On such calls, AMGEN personnel discuss the clinical aspects of drugs, while the P4 representative talks about how to maximize profit via government reimbursements on such drugs. Joint calls were made for Xgeva by the Executive Brand Director of Marketing Brendan Teehan and Raj Mantena to Georgia Cancer Specialists, The Treo Group, and Michiana Hematology/Oncology, as well as others. AMGEN's Executive Directors of Regional Sales, Thomas Riga, has bragged that he listened to a phone call in which Raj Mantena and Brendan Teehan negotiated with James Gilmore at Georgia Cancer Specialists to place a data agreement in Georgia Cancer to pay them $200 per patient prescribed XGeva.

42. In February of 2011, Brendan Teehan and Raj Mantena had a joint call with the office practice manager at Michiana Hematology/Oncology as well as others in the practice. Brendan Teehan talked about the clinical benefits of Xgeva and then turned the call over to Raj Mantena to discuss how the practice could increase their government reimbursements by writing Xgeva, and to discuss what other incentives

Raj Mantena could potentially give them to switch. For the three months prior to the call, Michiana Hematology/Oncology wrote $204,000 of Xgeva prescriptions, but for the three months after the joint call, the practice wrote $754,000 of Xgeva prescriptions. In the following period, three month period from June 2011 through August 2011, Michiana Hematology/Oncology wrote $803,000 of Xgeva of prescriptions, and for the three month period from September 2011 through November 2011, Michiana Hematology/Oncology wrote $788,000 of Xgeva prescriptions.

43. P4 is heavily intertwined with the key decision makers at AMGEN both because of the results he produces, and because Raj Mantena personally "wines and dines" such individuals. P4 has given substantial gifts of meals and entertainment to AMGEN decision makers in order to ensure support for P4 and its business practices. Examples of these gifts, meals and entertainment are Masters golf outings, US Open tickets, racecar experiences, hockey games, adult entertainers, and luxury transportation. Among those AMGEN personnel who are known to have participated at these events are Jim Daly, the former Senior Vice President, North America Commercial Organization, Stuart Arbuckle, Vice President, General Manager of the Oncology Business Unit, Brendan Teehan, the Executive Director of Xgeva marketing, and Al DeJesus, the former Executive Director of Aranesp Marketing, Executive Sales Directors.

44. Raj Mantena "wines and dines" these key decision makers at AMGEN as it is necessary to obtain the cooperation of Senior Executives at AMGEN for this scheme to work. Pursuant to an AMGEN protocol called CP800, all vendor contracts over $250,000 must be put out to a competitive bidding process, and potential vendors must be notified with a request for proposal. As P4 contracts are excessive in cost and methods for hiding the flow of money for illegal purposes, they would not survive such a competitive bidding process. To override the process, a CP800 exemption form must be submitted, and then the approval of an AMGEN Vice President is

required and is received. In the services of Webexs and advisory boards, rarely are CP800 exemption forms submitted, let alone approved. Other vendors are almost always required to go through a competitive bid process, yet P4 has routinely been exempt from competitive bids by submitting CP800 exception forms, with the cited reason for such an exemption frequently being Raj Mantena's "special relationships."

45. The influence that Raj Mantena has at AMGEN is so prevalent, that when Relator Spencer Miller and others attempted to drop P4 from the approved vendors list, due to what was seen as poor work product and exorbitant pricing, Jim Daly, the former Senior Vice President, North America Commercial Organization, overrode this decision.

46. Many AMGEN Executives are eager to work with Raj Mantena and P4 due to the sales numbers that he brings as a result of his influence. Raj Mantena has demonstrated an ability to generate large prescription orders at will. When AMGEN is missing its sales numbers, its employees will often call Raj Mantena and in turn he will use his "influence" to get physicians to buy the desired amount of the drug required for AMGEN to hit its sales numbers.

47. For example, Thomas Riga has bragged to William Davis that in late December of 2009, at the request of Joe Turgeon, the former Vice President of Sales, he called Raj Mantena and said that AMGEN needed $5,000,000 in Neulasta orders by the end of the day in order to meet the semester's sales numbers. Within ninety minutes of the phone call, a total of $2,500,000 worth of Neulasta orders were placed by South Carolina Oncology Associates and Virginia Cancer Institute, after they received phone calls from Raj Mantena. It is known that the individual Raj Mantena talked to at Virginia Cancer Institute was Tom Gallo, the Office Practice Manager.

48. Similarly, in third quarter of 2011, Joel Schaedler of P4 told Thomas Riga that he received more funding from AMGEN for data agreements and that he wanted to know which practices needed to be "juiced." He asked Thomas Riga for a

list of his bottom five Xgeva accounts that he needed help with. Thomas Riga told him that to date, Augusta Oncology had placed minimal orders and he needed help there. Shortly thereafter, Thomas Riga learned from Tracey Duffy, the Office Practice Manager at August Oncology, that P4 had placed a data agreement in Augusta Oncology which pays Augusta Oncology $200 per patient put on Xgeva and that this $200 payment made the margin favorable and they would start writing more Xgeva. As a result, the value of the Xgeva prescriptions written at Augusta Oncology went from $123,750 and $138,000 in the two three month periods prior to the data agreement being placed, March-May and June-August respectively, to $468,000 in the three months, September-November, after it was placed.

49.  Raj Mantena puts important or influential oncologists and urologists on the P4 payroll as consultants, allowing for AMGEN to funnel kickbacks through P4 to these influential individuals, and also enabling AMGEN to circumvent AMGEN's own internal compliance and state reporting guidelines.

50.  All the wining and dining of physicians and clinics, the P4 Summits, and the payments to get physicians and clinics to prescribe AMGEN's drugs are made possible though the exorbitant amounts paid by AMGEN to P4 for the "services" and "data" P4 provides to AMGEN.

51.  These examples indicate that AMGEN is aware that Raj Mantena and P4 are achieving results for them that are not consistent with legitimate behavior.

## FIRST CLAIM FOR RELIEF

### (Conspiracy Under False Claims Act)

52.  Plaintiffs refer to each and every one of the above paragraphs and incorporate those paragraphs as though set forth in full in this cause of action.

53.  Defendants have conspired to defraud the United States Government in the reimbursement of costs for oncology drugs Neulasta (pegfilgrastim), Neupogen

(pegfilgrastim), Xgeva (denosumab), Aranesp (darbepoetin alfa), Vectibix (panitumumab), Prolia (denosumab), and Nplate (romiplostim).

54. Defendants and each of them have conspired through disguised rebates and kickbacks to generate substantial over-prescription of certain oncology drugs produced by AMGEN to generate unnecessary reimbursements from Medicare, the PHS, VA, and DoD, by using forbidden practices, including, among other things, direct payments to individuals in exchange for prescribing AMGEN's oncology drugs.

55. These actions described herein violate the "Anti-Kickback" statute of 42 U.S.C. § 1320a-7a.

56. Defendants and each of them have conspired to manipulate and inflate the "Average Selling Price" for Medicare. These actions have cost the United States Government vast sums in unnecessary Medicare reimbursements.

57. Defendants and each of them have conspired to manipulate and inflate the "Best Price" for other government agencies, including the PHS, the VA and the DoD for oncology drugs by concealing from the true price of the drugs secret rebates and kickbacks. These actions have cost the United States Government vast sums in overpayments by the PHS, VA and DoD.

## PRAYER

WHEREFORE, Plaintiffs and Relators pray for judgment against defendants as follows:

1. For treble damages under 31 U.S.C. § 3729 for the amount of damages the United States has sustained.
2. For civil penalties under 31 U.S.C. § 3729 in the amount of $10,000 for each violation.
3. For costs of suit and attorneys' fees.
4. And for such other and further relief as the Court deems proper

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: January 19, 2012

MILLER MILLER MENTHE
ATTORNEYS AT LAW

BY: _____
Darrel C. Menthe
Adam Miller
Scott Miller
Attorneys for Plaintiffs and Relators William Davis and Spencer Miller